HART AND MILLER ISLANDS AREA ENVIRONMENTAL GROUP, INC. and Honorable Clarence Long, M. C. and Honorable Norman R. Stone and Maryland Wildlife Federation, Inc. and John Henderson and Howard Sappington and George Wohlleben and Robert Scott and Margaret Caldwell and Charles Justice, Plaintiffs,

v.

The CORPS OF ENGINEERS OF THE UNITED STATES ARMY and Honorable Clifford L. Alexander, Secretary of the Army and Lt. Gen. John W. Morris, Chief of Engineers of the United States Army and Col. G. K. Withers, District Engineer, Baltimore District, U. S. Army, Corps of Engineers, Defendants,

State of Maryland Ex Rel. Francis B. Burch, Attorney General and Steamship Trade Association of Baltimore, Inc., Intervening Defendants.

Civ. No. HM77–973.

United States District Court,
D. Maryland.

Dec. 23, 1980.

Edward B. Rybczynski and Ralph K. Rothwell, Jr., Baltimore, Md., for plaintiffs.

Russell T. Baker, Jr., U. S. Atty., D. Md., and Edward M. Norton, Jr., Asst. U. S. Atty., Baltimore, Md., Nancy Long and Lawrence R. Liebesman, Attys., Dept. of Justice, Washington, D. C., for defendants The Corps of Engineers and the Secretary of the Army.

James K. Robinson and Michael B. Hare, Baltimore, Md., for Baltimore Dist. Corps of Engineers.

William C. Stifler, III, and Warren K. Rich, Baltimore, Md., for intervening defendant Steamship Trade Ass'n of Baltimore, Inc.

Stephen H. Sachs, Atty. Gen. of Md., Paul F. Strain, Scott A. Livingston and Robert B. Harrison, III, Asst. Attys. Gen., Baltimore, Md., for intervening defendant State of Md.

HERBERT F. MURRAY, District Judge.

This lawsuit involves the planned construction of a diked dredged spoil disposal facility at the Hart and Miller Islands in Baltimore County, Maryland. On June 30, 1977, a number of environmental groups and concerned individuals filed suit against the United States Army Corps of Engineers, challenging the Corps' decision to issue a permit to the State of Maryland for the Hart and Miller Islands disposal structure.[1] This court granted the motions of the State of Maryland and the Steamship Trade Association of Baltimore, Inc. to intervene as defendants in this action on October 10, 1977.

On May 31, 1978, all parties filed cross-motions for summary judgment. By memorandum and order dated October 24, 1978, 459 F.Supp. 279, this court granted plaintiffs' motion for summary judgment on Count One of their complaint. The court held that the Corps of Engineers erroneous-ly processed the State of Maryland's permit application according to the provisions of section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, rather than section 9 of the Act, 33 U.S.C. § 401, which, unlike section 10, requires Congressional approval before a permit is issued. The Fourth Circuit Court of Appeals reversed this decision, however, 621 F.2d 1281 (1980), and the Supreme Court denied plaintiffs' petition for a writ of certiorari, —— U.S. ——, 101 S.Ct. 544, 66 L.Ed.2d 300 (1980). Consequently, the case is now before this court for the disposition of the still pending cross-motions for summary judgment on the remaining counts of plaintiffs' complaint. On September 19, 1980, the parties submitted supplemental memoranda making current their previously filed summary judgment pleadings, and the cross-motions for summary judgment were the subject of oral argument before the court on October 10, 1980.

I. BACKGROUND

On February 23, 1972, the State of Maryland, through its Department of General Services, filed an application with the Army Corps of Engineers for a permit pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq., and section 404 of the Federal Water Pollution Control Act Amendments of 1972, as amended, 33 U.S.C. § 1344, to construct a diked dredged spoil disposal facility at the Hart and Miller Islands in the Chesapeake Bay. The Hart and Miller Islands site was selected by the State of Maryland on the basis of a study performed in 1969 by Green Associates and Trident Engineering Associates (A.R. 3, 122).[2] Trident and Green, now known as Century Engineering, is a private contractor and was retained by the State of Maryland to perform this study as well as to design the diked disposal structure.

---

1. Jurisdiction of this court is founded upon 28 U.S.C. § 1331(a).

2. The abbreviation "A.R. 3" refers to entry number three in the Government's Index to the Administrative Record in this case, filed on March 6, 1978. The Government's Index describes the administrative record of the Corps' consideration of the State of Maryland's permit application. The parties have agreed that the entire administrative record need not be filed, and the parties have submitted those documents which they feel bear on the issues raised in the motions for summary judgment as exhibits to their motions. The court is at liberty to request that any additional documents be supplied should the court feel the need to examine them.

The Hart and Miller Islands are located within the Chesapeake Bay approximately thirteen miles east of Baltimore, Maryland. The dike and containment area is to be constructed on the bayward (eastern) side of the Hart and Miller Islands about one mile from the mainland and will occupy an area of 1,100 acres or approximately two square miles. The stated purpose of the diked disposal area is to contain approximately fifty-two million cubic yards of dredged spoil to be removed from the Baltimore Harbor and its approach channels.

When the dike is completed, its walls will stand eighteen feet above mean low water, somewhat higher than the current maximum elevations of the Hart and Miller Islands, which are 5.5 feet and 2.3 feet, respectively. However, only twelve percent of Hart Island and fifty-two percent of Miller Island will be covered by the disposal area. Basically, the disposal area will be rectangular in shape with the islands fitting into the northwestern, longer side of the area and the structure occupying principally an area to the southeast of the islands. Dredged spoil will be transported to the disposal area by pumping the material through hydraulic pipelines either from dredging sites in the Baltimore Harbor or from barges which will carry the dredged spoil from the dredging site to the disposal area. The dredged material will be pumped into the diked containment area and the sand walls of the dike will allow the water to percolate out of the containment area, leaving only the dredged material inside. Once the area has been completely filled with dredged spoil, the entire structure will be at the height of eighteen feet above mean low water. As a means of protection against erosion on the bayward side of the structure, this side will be rip-rapped with stone, all other sides consisting of the sand-constructed walls of the dike.

The Corps of Engineers held a public hearing on August 29, 1972 to consider the State of Maryland's permit application (A.R. 57). On February 22, 1973, the Corps completed its draft Environmental Impact Statement (A.R. 177). At least in part to address objections raised to the proposed Hart and Miller Islands project, the State of Maryland arranged to have a private consultant, Roy Mann Associates, Inc., evaluate certain aspects of the plans for the structure. The Mann Report was completed in July 1975, and is entitled, "Peer Review of the Evaluation of Hart and Miller Islands and Alternatives for Dredged Materials Disposal" (A.R. 634). A second public hearing was held on May 10, 1975 (A.R. 527), and in February 1976, the Corps of Engineers, as required by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., issued its Final Environmental Impact Statement (E.I.S.) (A.R. 745). Upon completion of the Impact Statement, the District Engineer for the Baltimore District prepared a report on the application recommending issuance of the permit with the inclusion of certain conditions in the permit (A.R. 744). This recommendation was concurred in by the Corps' North Atlantic Division on March 8, 1976 (A.R. 755), and the final report was sent to the Corps' headquarters in Washington for final approval. Final approval was given in November 1976, and the State of Maryland was issued a permit for the diked disposal facility under 33 U.S.C. §§ 403 and 1344 (A.R. 815, 816, 817).

## II. PRIVATE RIGHT OF ACTION

The court feels it necessary to address at the outset an issue to which two of the parties have made reference in their pleadings. On November 17, 1978, defendant State of Maryland filed a supplemental memorandum raising the issue of whether a private right of action may be maintained under the Rivers and Harbors Act. In the current posture of the case, however, this issue need not be decided. This is because only Count One of plaintiffs' complaint, which has already been determined to be without merit, is founded solely upon the Rivers and Harbors Act; the remaining counts are based primarily upon the National Environmental Policy Act (NEPA).

Summary judgment in favor of plaintiffs on Count One of their complaint had already been entered by this court at the time

defendant State of Maryland's supplemental memorandum was filed. However, there were pending before this court at that time the motions of three defendants seeking a reconsideration of the court's summary judgment ruling. Presumably, it was in conjunction with these motions that defendant State of Maryland submitted its supplemental memorandum on the private cause of action issue; the matter is not raised in defendant State of Maryland's supplemental memorandum filed on September 19, 1980, submitted in support of defendant State of Maryland's motion for summary judgment on those counts of plaintiffs' complaint which are still pending.

The question of whether a private cause of action should be recognized in this case is nonetheless before the court at this time, because it is raised in the supplemental memorandum of defendant Steamship Trade Association of Baltimore, Inc., filed on September 19, 1980, in support of its motion for summary judgment. The Steamship Trade Association's memorandum discusses whether there is a private cause of action under the Rivers and Harbors Act, and, as stated above, that is no longer an issue in this case. Defendant Steamship Trade Association's memorandum, however, also cites the case of *Mountainbrook Homeowners Association, Inc. v. Adams*, 492 F.Supp. 521 (W.D.N.C.1979), *aff'd*, 620 F.2d 294 (4th Cir. 1980), opinion published at 10 ELR 20352 (May 16, 1980), and the *Mountainbrook* opinion discusses whether or not there is a private cause of action available under NEPA. This issue, of course, remains pertinent to the case in its current posture.

Plaintiffs in *Mountainbrook* included individuals as well as an association of homeowners. These plaintiffs brought an action under NEPA, alleging that defendants had failed to comply with provisions of an environmental impact statement regarding the construction of a highway near their homes. The district court dismissed the plaintiffs' case, holding that no private cause of action is available under NEPA.

The *Mountainbrook* decision, however, is readily distinguishable from the case at bar. In the case before this court, plaintiffs are seeking to enjoin the construction of a project, not to enforce compliance with the environmental impact statement prepared in conjunction with it. The district court in *Mountainbrook*, at 529, relied on this distinction in reaching its holding:

Many federal courts have permitted the maintenance of actions brought by private parties and have fashioned and enforced remedies. It is true that most of these actions have been brought to compel the federal agency involved to comply with "NEPA" by preparing and filing an adequate environmental impact statement, and the courts have enjoined the project until such statement was prepared and filed.

This Court has found no case wherein a private party has been permitted to maintain an action for the failure to comply with the provisions of an Environmental Impact Statement. The Plaintiffs have cited no such case supporting their contentions as advanced here. It appears that these Plaintiffs have no cause of action, either express or implied, under "NEPA" to enforce the provisions of the statement and that the complaint must be dismissed for failure to state a cause of action upon which relief can be granted.

It is true that at some points in its opinion, the district court in *Mountainbrook* uses broad language which might be read to imply that there can be no private action whatsoever under NEPA. In affirming the district court, however, the Fourth Circuit did not employ such language; to the contrary, the Court of Appeals held that there was no private cause of action stated "[i]n the circumstances of this case," and cited *City of Blue Ash v. McLucas*, 596 F.2d 709, 712 (6th Cir. 1979), like *Mountainbrook*, a case in which plaintiffs sought to enforce rather than to challenge the provisions of an Impact Statement.

In *Mountainbrook*, the district court recognized that many federal courts have en-

tertained private actions brought under NEPA which challenge the adequacy of environmental impact statements, and distinguished *Mountainbrook* from those cases. The Fourth Circuit, in affirming, apparently sought to limit the *Mountainbrook* holding strictly to its facts. The Supreme Court entertained private actions alleging, *inter alia*, violations of NEPA in two recent cases without raising the private right of action question; *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). For these reasons, this court believes that plaintiffs have brought a proper claim under NEPA, and that the contention of defendants State of Maryland and Steamship Trade Association, implied in their supplemental memoranda, that no private cause of action exists under NEPA is not a correct statement of the law as it applies to the case at bar.

## III. COMPLIANCE WITH LOCAL LAW AS MANDATED BY CORPS OF ENGINEERS REGULATIONS

In Count Six of their complaint, plaintiffs contend that defendants have failed to comply with 33 C.F.R. § 202.120(f)(3) (1978), renumbered, 33 C.F.R. § 320.4(j)(6) (1979), a United States Army Corps of Engineers regulation which states:

> Permits will not be issued where certification or authorization of the proposed work is required by Federal, State and/or local law and that certification or authorization has been denied.

Plaintiffs allege two instances of failure to secure authorization as required by 33 C.F.R. § 320.4(j)(6). First, plaintiffs assert that no permit has been obtained from the State of Maryland's Secretary of Health and Mental Hygiene pursuant to Article 43, sections 394 and 394A of the Annotated Code of Maryland, 1957 (1980 Replacement Volume). Second, plaintiffs point out that the permittee, State of Maryland, has not obtained the zoning exception from Baltimore County which is required before a sanitary landfill can be developed in an area zoned for agricultural use, which is the zoning of the area within which the Hart and Miller Islands are located.

Sections 394 and 394A of Article 43 of the Maryland Code require that a permit be secured from the State of Maryland's Secretary of Health and Mental Hygiene before the operation of a landfill refuse disposal system may be commenced. Section 394A further directs that the Department of Health and Mental Hygiene shall not issue a permit for a landfill facility unless all county zoning and land use requirements have been met, and an affirmative statement that the board of county commissioners or the county council does not oppose the issuance of the permit has been obtained. Plaintiffs allege both that no affirmative statement of non-opposition has been obtained and that no Maryland Department of Health and Mental Hygiene permit has been issued.

■ Countering plaintiffs' charges of non-compliance, defendants assert that sections 394 and 394A of Article 43 do not apply to the Hart and Miller Islands project because the proposed diked disposal facility is not a "landfill refuse disposal system." The court finds the defendants' support for this position to be persuasive, and holds that sections 394 and 394A do not apply to the case at bar.

The term "landfill refuse disposal system" is not defined in Article 43 of the Maryland Code. Defendant State of Maryland points to other definitions found in the Code and related regulations, however, which do offer some general insight as to the meaning of this term. Maryland Code Article 43, § 387C(a)(16) defines "solid waste acceptance facility" as any sanitary landfill, incinerator, transfer station or any other type of plant, the primary purpose of which is for the disposal, treatment or processing of solid wastes. At the time the permit involved in this lawsuit was issued, § 387C(a)(14) defined "solid wastes" to mean litter and all refuse materials, other than gaseous and liquid wastes, from all public and private establishments and resi-

dences, including shopping centers.[3] "Refuse disposal" is defined by COMAR § 10.03.30.07 to include the disposal of all solid waste, except sewage, including garbage, rubbish and solid market and industrial wastes.

Plaintiffs argue from this series of definitions that a containment facility for industrial wastes satisfies the criteria which define a landfill refuse disposal system. They then direct the court's attention to pages nineteen through twenty-five of the Environmental Impact Statement prepared by the Corps of Engineers regarding the Hart and Miller Islands project, where the polluted nature of the waters and sediments of the Baltimore Harbor is described as including a distribution of several metals, reflecting inputs from the industrial complex which the Baltimore Harbor supports. Thus, conclude plaintiffs, sediments containing industrial wastes will be deposited at the proposed diked disposal facility, and that facility will therefore be a landfill refuse disposal system within the purview of § 394A of Article 43. Plaintiffs further point out that a portion of the Hart and Miller Islands project will cover parts of the islands themselves, and thus some of the industrial wastes will be deposited on land.

This court finds plaintiffs' conclusion to be unfounded. There is nothing in the definitions set forth above which indicates that every facility for the disposal of industrial wastes is, by virtue of that fact, deemed to be a landfill refuse disposal system. Furthermore, there is strong evidence that the dike envisioned for the Hart and Miller Islands is not a project governed by Article 43, §§ 394, 394A.

Although the fact that industrial wastes are to be deposited in a containment facility may be probative on the question of whether or not that facility is a landfill refuse disposal system, this court believes that the nature of the facility itself is a characteristic more significant in this regard than

what materials are to be deposited there. The April 1977 issue of the periodical, *Solid Wastes Management,* offers a compilation of the definitions of sanitary landfill which have been enacted as statutes or regulations by various states, and an excerpt is attached to defendant State of Maryland's memorandum in support of its motion for summary judgment. Although Maryland is not included in the compilation (it has not enacted any definition of this term), most states are, and their definitions are generally quite similar. North Carolina's description is representative:

Sanitary Landfill: means a method of disposing of solid waste on land in a sanitary manner without creating nuisances or hazards to public health or safety by utilizing the principles of engineering to confine the solid waste to the smallest practical volume, and to cover it with a layer of compacted earth at the conclusion of each day's operation or at such more frequent intervals as may be necessary.

The Environmental Impact Statement prepared by the Army Corps of Engineers presents a description of the proposed Hart and Miller Islands diked disposal structure:

The State of Maryland proposes to construct a diked disposal area adjacent to the islands to contain bottom sediments dredged from Baltimore Harbor and its approach channels ... The dredged material and water are pumped into the enclosure where the sediments settle and the water slowly percolates through the bottom of the dike until a water level equilibrium is reached ... The dredging will be predominantly sand.

(E.I.S. 1).

A comparison of North Carolina's definition of a sanitary landfill and the E.I.S. characterization of the Hart and Miller Islands project illustrates the significant differences between them. There will be no compacting of wastes at the Hart and Mil-

---

**3.** Section 387C(a)(14) as amended July 1, 1980, states that "solid wastes" means any garbage, refuse, sludge or liquid from industrial, commercial, mining or agricultural operations and from community activities, but does not include solid or dissolved material in domestic sewage or in irrigation return flows.

ler Islands facility, and daily deposits will not be covered with layers of soil; similarly, the percolation feature which is integral to the design of the diked facility is not a typical feature of sanitary landfills.

There is additional support for the position that the Hart and Miller Islands project is not one governed by sections 394 and 394A. The affidavit of Walter A. Miles, Chief of the Division of Solid Waste for the Maryland Department of Health and Mental Hygiene, has been submitted as an exhibit in support of defendant State of Maryland's motion for summary judgment. In his affidavit, Mr. Miles states that he is responsible for the administration of Article 43, § 394 of the Maryland Code, that he has reviewed Count Six of plaintiffs' complaint, and that the diked disposal area to be located adjacent to the Hart and Miller Islands is not a landfill subject to § 394A. Mr. Miles continues as follows:

> Diked disposal areas, which are utilized for the containment of dredged spoil located on dry land, marsh land, or in the water, have never been subjected to the requirements of Section 394A. In addition, a diked disposal area has never been construed to be a solid waste acceptance facility pursuant to Article 43, Section 387C(a)(16).

Perhaps the most persuasive evidence of the Maryland legislature's intent not to include under Article 43, § 394A diked disposal areas like the one proposed for the Hart and Miller Islands is the amendments made to that provision of the Maryland Code in 1979. Before these amendments, § 394A set forth the requirements which had to be satisfied prior to the issuance of a permit

for a "landfill refuse disposal system;" in 1979, the phrase "or sludge composting facility" was added to this section.[4] Consequently, the court infers that the Maryland legislature believes that there is a distinction between landfill refuse disposal systems and sludge composting facilities, and that prior to the 1979 amendments, § 394A applied only to the former.

Webster's Third New International Dictionary of the English Language (Unabridged, 1971) defines a landfill as a site for the disposal of trash and garbage by burial under layers of earth in low ground; sludge is defined to mean a muddy or slushy mass, deposit or sediment. As noted above, the Environmental Impact Statement for the Hart and Miller Islands project states that the proposed dike will contain "bottom sediments dredged from Baltimore Harbor and its approach channels" (E.I.S. 1). This dredged material neatly fits Webster's definition of sludge, and the court believes that the Hart and Miller Islands diked disposal area is more akin to what the Maryland legislature meant by the term "sludge composting facility" than it is to a "landfill refuse disposal system."[5]

For the reasons discussed above, this court holds that sections 394 and 394A of Article 43 of the Maryland Code do not apply to the Hart and Miller Islands diked disposal project, and that the failure to obtain a permit from the Maryland Department of Health and Mental Hygiene and an affirmative statement of non-opposition from Baltimore County officials does not constitute a violation of Army Corps of Engineers regulation 33 C.F.R. § 320.4(j)(6) (1979).

---

4. Also appended to the language of § 394A in 1979 was the following: "The provisions of this section relating to sludge composting facilities do not apply to sites with permits pending with the Department before June 1, 1979." The court interprets this statement to imply that the "sludge composting facility" provisions are not meant to govern the Hart and Miller Islands project, the permits for which were applied for with the pertinent authorities well before June 1, 1979.

5. Plaintiffs stress that some portion of the dredged sediments will be deposited on the

islands themselves, thus attempting to bring the proposed dike more closely within the definition of a landfill. The court does not find this inference logically compelling. Furthermore, although not addressed to the definitional problems involved here, at least two recent Maryland Court of Appeals cases have discussed the existence of sludge composting facilities located completely on land; see Washington Suburban Sanitary Commission v. Nash, 284 Md. 376, 396 A.2d 538 (1979); Pitman v. Washington Suburban Sanitary Commission, 279 Md. 313, 368 A.2d 473 (1977).

Plaintiffs' second allegation pertaining to the Corps regulation's mandate of local law compliance is directed to the failure of the State of Maryland, as permittee, to obtain a zoning exception from Baltimore County. Plaintiffs contend in this regard that the area of the proposed project site is currently zoned for agricultural use, and that before a diked disposal facility can be legally placed there, Baltimore County officials must grant a special zoning exception.

In response, defendant State of Maryland relies on the holding in *Mayor and City Council of Baltimore v. State of Maryland*, 281 Md. 217, 378 A.2d 1326 (1977). That action was brought by the State of Maryland, which sought a declaration that city zoning, building, fire and other codes and ordinances could not be applied against the State's use of property for a correctional institution in Baltimore City. The Court of Appeals of Maryland affirmed the lower court's decision to grant the declaratory relief prayed, reasoning that

Article 66B, § 2.01 *et seq.*, which grants Baltimore City its zoning authority, neither specifically provides nor clearly implies that the State is intended to be subject to its provisions. In this respect, it is a basic and long-standing principle of statutory construction that the State is not deemed to be bound by an enactment of the General Assembly unless the enactment specifically names the State or manifests a clear and indisputable intention that the State is to be bound. . . Thus, since the General Assembly has neither named the State nor manifested an intention that the State be bound in the provisions of the Zoning Enabling Act,

Baltimore City has no authority to subject the State's use of the Continental Can property to its zoning ordinance. *Id.*, 223–224, 378 A.2d 1326.

The holding in *Mayor and City Council of Baltimore v. State of Maryland, supra*, was founded upon the language of Article 66B, § 2.01 of the Maryland Code, which grants to Baltimore City the power to enact zoning regulations. The zoning regulations which plaintiffs allege need to be complied with in this case, however, are those of Baltimore County. The chartered counties of Maryland are authorized to enact zoning laws by Article 25A, § 5(x) of the Maryland Code. This section is identical to Article 66B, § 2.01 in all respects pertinent to the holding in *Mayor and City Council of Baltimore*; the General Assembly has neither named the State nor manifested any intention that the State be bound in the wording of Article 25A, § 5(x)[6]. Furthermore, the *Mayor and City Council of Baltimore* result was held to apply to county zoning regulations in *Harbor Island Marina, Inc. v. Board of County Commissioners of Calvert County*, 286 Md. 303, 315, 407 A.2d 738 (1979).

▪ In view of the decisions of the Court of Appeals of Maryland noted above, this court holds that the State of Maryland's Hart and Miller Islands project is not subject to the zoning ordinances of Baltimore County. In addition, as was previously discussed, this court has determined that Article 43, §§ 394 and 394A of the Maryland Code do not govern the diked disposal site which is the subject of this lawsuit. For these reasons, plaintiffs' argument that the requirements set forth at 33 C.F.R. § 320.-

---

**6.** Article 66B, § 2.01, Md.Code Ann., 1957 (1978 Replacement Vol.) states:

For the purpose of promoting the health, security, general welfare, and morals of the community, the mayor and city council of Baltimore City are hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, off-street parking, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, signs, structures, and land for trade, industry, residence, or other purposes. (Ann.

Code, 1951, § 1; 1939, § 1; 1927, ch. 705, § 1; 1970, ch. 672, § 1.)

Article 25A, § 5(x), Md.Code Ann. 1957 (1980 Cumulative Supplement) states:

To enact local laws, for the protection and promotion of public safety, health, morals, and welfare, relating to zoning and planning including the power to provide for the right of appeal of any matter arising under such planning and zoning laws to the circuit court except as is provided in § 5(U) of this article. Any decision of the circuit court may be appealed to the Court of Special Appeals.

4(j)(6) (1979) have not been satisfied must fail, and defendants' motions for summary judgment as to Count Six of plaintiffs' complaint will, therefore, be granted.

## IV. THE CORPS' DECISION–MAKING PROCESS AND THE NATIONAL ENVIRONMENTAL POLICY ACT

The remaining counts of plaintiffs' complaint raise various challenges to the decision-making process which culminated in the approval of the State of Maryland's permit application by the Army Corps of Engineers. These challenges rely primarily upon the provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and their thrust is to a large extent directed at alleged failures of the Final Environmental Impact Statement prepared by the Corps to satisfy certain requirements of that Act, particularly 42 U.S.C. § 4332(2)(C) and (E):

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act [42 USCS §§ 4321 et seq.], and (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved.

\* \* \* \* \* \*

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

The Office of the District Engineer for the Baltimore District, Army Corps of Engineers, completed its Final Environmental Impact Statement on Maryland's permit application to build a diked disposal area at the Hart and Miller Islands in February of 1976. Count Two of plaintiffs' complaint alleges that the E.I.S. is inadequate because it does not consider several enumerated possible construction failures. In Count Three, plaintiffs allege that the mandate of 42 U.S.C. § 4332(2)(E) that "appropriate alternatives" be studied, developed and described, has not been fulfilled. Count Four asserts a failure to consider the cumulative effects of the proposed project as required by Corps of Engineers regulations; see 33 C.F.R. § 320.4(2)(iv) (1979). Plaintiffs allege in Count Five that the general environmental effects of the proposed Hart and Miller Islands dike are not adequately considered in the Impact Statement, in Count Seven contend that the assessment of costs made in the E.I.S. is inaccurate and invalid, and in Count Eight assert that substantial questions as to the feasibility and advisability of the project are ignored or minimized by the E.I.S. In Count Nine, plaintiffs claim that the Corps of Engineers acted in bad faith by withholding information from the Department of the Interior during the permit review process. Count Ten asserts that the Impact Statement devotes only minimal attention to the concerns and opinions expressed by residents living in the area of the proposed dike, and that to the extent that the Corps of Engineers has mentioned these residents in the E.I.S., it

has done so in a bad faith attempt to malign their character. Finally, Count Eleven is based upon the Administrative Procedure Act, and asserts that the Corps' decision to issue the Hart and Miller Islands permit was "arbitrary, capricious and an abuse of discretion." [7]

In light of recent decisions of the Supreme Court, it is clear that in cases brought pursuant to NEPA, this court's role is limited and its scope of review is narrow:

> In *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 [98 S.Ct. 1197, 1219, 55 L.Ed.2d 460] (1978), we stated that NEPA, while establishing "significant substantive goals for the Nation," imposes upon agencies duties that are "essentially procedural." As we stressed in that case, NEPA was designed "to insure a fully informed and well-considered decision," but not necessarily "a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decision-making unit of the agency." *Ibid.* *Vermont Yankee* cuts sharply against the Court of Appeals' conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations. On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21 [96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576] (1976). *See also FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326 [96 S.Ct. 579, 46 L.Ed.2d 533] (1976).

*Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra*, 444 U.S. at 227–228, 100 S.Ct. at 499–500 (footnote omitted). *See also National Center for Preservation Law v. Landrieu*, 496 F.Supp. 716, 724–725 (D.S.C.1980); 5 U.S.C. § 706(2)(A).[8] This court will now address the specific allegations of plaintiffs' complaint, bearing in mind the instruction of *Strycker's Bay Neighborhood Council* as to its function on review.

### A. *Possible Construction Failures*

Plaintiffs allege in Count Two of their complaint that the Corps of Engineers failed to consider adequately questions raised about the structural integrity of the proposed dike. Their claim in this regard has two prongs. First, plaintiffs rely on section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, which they contend, and defendants concede, imposes a duty on the Corps to examine rigorously the plans and specifications for structures to be constructed in the navigable waters of the

---

**7.** *See* 5 U.S.C. § 706(2)(A).

**8.** This court has examined several cases involving claims under NEPA which rely on the Supreme Court's holding in *Strycker's Bay Neighborhood Council v. Karlen, supra*. Every decision this court has studied has held that the requirements of NEPA were satisfied; *Citizens for Mass Transit, Inc. v. Adams*, 630 F.2d 309 (5th Cir. 1980); *South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005 (5th Cir. 1980); *Swinomish Tribal Community v. Federal Energy Regulatory Commission*, 627 F.2d 499 (D.C.Cir.1980); *Lange v. Brinegar*, 625 F.2d 812 (9th Cir. 1980); *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir. 1980); *National Indian Youth Council v. Andrus*, 501 F.Supp. 649, No. Civ–78–586C, (Slip Op., D.N. Mex., Aug. 22, 1980); *National Center for Preservation Law v. Landrieu, supra*. In *North Slope Borough v. Andrus*, 486 F.Supp. 332 (D.D.C.1980), the District Court, although expressly recognizing the mandate of *Strycker's Bay Neighborhood Council*, held that the Environmental Impact Statement involved there did not pass muster under NEPA. This decision, however, was reversed on appeal, No. 80–1148 (Slip Op., D.C.Cir., October 9, 1988):

> The District Court recognized explicitly its limited competence to overturn the Secretary of the Interior on NEPA grounds, *citing Vermont Yankee* and *Strycker's Bay Neighborhood Council v. Karlen*. The Court's formal tribute to these Supreme Court cases, however, was somewhat impugned by the punctilio of scrutiny to which the Secretary's EIS was subjected. The EIS is both a tool and a test to make sure that an agency takes a good "hard look" at the pertinent environmental questions. We agree with the District Court's understanding that giving "reasonable consideration to all significant impacts" is all that can be demanded of an agency [footnotes omitted].

United States.[9] Second, plaintiffs argue that the absence of any discussion of the environmental effects which would ensue from several possible construction failures renders the E.I.S. in this case insufficient under the requirements of NEPA. Plaintiffs cite as possible construction failures the following: failure to complete once started, failure or inability to close the dike, failure to hold spoil, failure to retain pollutants, sinking of portions of the dike, sliding of portions, and any other breaching of the dike.[10]

Plaintiffs point to evidence which does, in fact, raise serious questions about the structural integrity of the Hart and Miller Islands dike as designed. The Peer Review Evaluation issued by Roy Mann Associates summarizes its findings regarding dike safety at 103–104 (A.R. 634):

1. From the specified design condition, it is estimated that the structure is designed for storms of 15-year return periods. The probability of encountering such a storm during the vulnerable period of the dike structure is quite high.

2. The crest height of the structure is not sufficient to prevent wave overtopping. The condition is more severe at the Hart-Miller Site and the Black Marsh Site than the others.

3. The riprap protection is marginal and is nonconservatice [sic] for offshore structures.

4. The toe protection is marginal to inadequate in view of the poor foundation condition.

5. The back slope of IV5H is judged adequate as long as the friction angle of the material remains larger or equal to 27° as claimed by the designer. There is no provision, however, for the inner bank to resist erosion due to heavy rain.

6. The evidence is insufficient to demonstrate the IV3H front slope to be adequate. This slope appeared to be non-conservative for offshore structures with hydraulic filling. Further analysis to ensure its adequacy is warranted.

7. There is insufficient information to indicate that the foundation problems have been thoroughly investigated. From the specifications and drawings provided by Century Engineering, the information appears to be inadequate to ensure proper preparation of foundation.

8. There is no convincing evidence that the local material is sufficiently adequate both in quality and quantity for dike construction. More documentation is required to establish these facts.

In addition, plaintiffs emphasize the importance of the affidavits of Dr. Hsiang Wang and Dr. Robert Kondner, submitted as exhibits to their motion for summary judgment.[11] Dr. Wang co-authored the engi-

---

**9.** 33 U.S.C. § 403 provides as follows:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War [Secretary of the Army]; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War [Secretary of the Army] prior to beginning the same. (Mar. 3, 1899, ch. 425, § 10, 30 Stat. 1151.)

**10.** Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 16.

**11.** Because they are not part of the administrative record in this case, it may be that the affidavits of Dr. Wang and Dr. Kondner may not properly be considered by this court in its review of the Corps' decision. In *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court stated that in applying the standards of review set out in 5 U.S.C. § 706(2)(A), "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." 411 U.S. at 138, 93 S.Ct. at 1242. *See also Federal Power*

neering portion of the Mann report, and in his affidavit, dated May 23, 1978, states that he continues to adhere to the conclusions of the report even after having examined all documents in the administrative record regarding the engineering aspects of the project dated after July 28, 1975, the date of the Mann study. Dr. Kondner's affidavit sets forth extensive evidence of Dr. Kondner's expertise as a civil engineer, and in his affidavit, dated May 15, 1978, Dr. Kondner expresses his opinion that the proposed design of the dike is unsatisfactory and his expectation "that dike sections will fail with total loss of structural integrity."

The teaching of *Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra,* is that "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences," 444 U.S. at 227, 100 S.Ct. at 500. In light of this standard, defendants' counter to the plaintiffs' charge that the structural integrity problems raised by the Mann Report received insufficient attention is persuasive; defendants point to documents in the administrative record which demonstrate that the Corps considered the stability of the proposed dike before deciding to approve the State of Maryland's permit application.

The issues of structural integrity raised by the Mann Report were noted above. First, in paragraphs one and two of its summary, the Mann Study suggests the possibility that the height of the proposed dike will prove insufficient to prevent wave overtopping during storms anticipated to occur at fifteen year intervals. Memoranda exchanged by the various departments of the Corps indicate that this concern was addressed and investigated. A memorandum dated August 15, 1975 (A.R. 659) from the Chief of the Corps' Engineering Division to the Chief of the Operations Division states:

1. This Division does not agree with the Roy Mann Associates' conclusion that an 18-foot-high dike at Hart-Miller Islands will be overtopped at 15-year intervals. In fact, this Division cannot conceive of a set of reasonably possible circumstances that would result in water (including wave runup on the proposed 1 on 3 slope) reaching higher than 11 feet above mean low water.

2. The design wave height suggested by Mann is impossible. Waves of 12 to 14 feet, unheard of in Chesapeake Bay, could not propagate in the shallow waters on the peripheral shoals guarding Hart and Miller Islands. A wave height on the order of 6 feet would be more reasonable and even such a wave would be an extremely rare event. Records of wave gages at Randle Cliffs near Chesapeake Beach, Maryland, and at the Chesapeake Bridge Tunnel substantiate this statement.

\* \* \* \* \* \*

4. In summary, the Engineering Division does not believe that an 18-foot-high dike at Hart-Miller Islands will ever be overtopped let alone at return intervals of 15 years. Furthermore, the overtopping, if it should occur, would not be a catastrophic event. We have not made a detailed cost comparison of Hart-Miller and alternative sites. We believe that the Century estimate, subject to some refinements in design, is not unreasonable.

Although conclusory statements like these might be deemed inadequate to demonstrate that the Corps actually considered the overtopping issue, subsequent documen-

---

*Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976): *Fayetteville Area Chamber of Commerce v. Volpe*, 515 F.2d 1021, 1024 (4th Cir. 1975), *cert. denied sub nom. Interstate 95 Committee v. Coleman*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140 (1975). The Mann Report is part of the administrative record, however (A.R. 634), and the Wang and Kondner affida-

vits essentially restate the conclusions reached there. Dr. Wang's position is also stated in letters written by him to George Lewis, Secretary of the State of Maryland Department of General Services, and to James Coulter, Secretary of the State of Maryland Department of Natural Resources, and these letters are part of the administrative record as well. (A.R. 696, 643).

tation supports the Corps' assertion that they did in fact investigate this problem. Corps of Engineers memoranda dated September 3, 1975 (A.R. 681) and September 17, 1975 (A.R. 689) set forth the Corps' conclusion and the data relied on in reaching that conclusion; the Engineering Division of the Corps, after examining tide records at Fort McHenry for the period 1903–1973, determined that the diked disposal area would be overtopped only by wave heights likely to occur once every 2000 years.

In paragraphs four, seven and eight of its summary, the Mann Report challenges the adequacy of foundation specifications and the suitability of sand located near the proposed site as material for the construction of the dike. A review of the administrative record supports defendants' contention that the Corps considered these problems before issuing its permit to the State of Maryland. In a memorandum dated April 19, 1973 (A.R. 242), the Corps set forth certain test data regarding foundation materials relied on by the designers of the dike, and concluded that "dike stability is still believed to be marginal." A later memorandum, dated February 20, 1974 (A.R. 341), indicates that after reviewing revised data, the Corps determined dike stability to be acceptable. Subsequent entries in the administrative record demonstrate that foundation stability continued to concern the Corps (A.R. 610, 646). Indeed, the record reflects that on October 22, 1975, seven officers of the Corps of Engineers met with five members of Century Engineering and a representative of the Maryland Department of General Services, and that several matters regarding the structural integrity of the proposed dike, including construction methodology, building materials and foundation stability, were addressed (A.R. 712, 716). Further-

more, a subsequent meeting was held on November 26, 1975, at which data regarding foundation stability was again reviewed (A.R. 729). Based on the evidence presented, this court concludes that the Army Corps of Engineers considered the problems raised by the Mann Report regarding construction materials and foundation stability.

■  The Peer Review study relied on by plaintiffs, in paragraph six of its summary, *supra*, also questioned the stability of the one-to-three front slope called for by the design specifications for the dike, as did Dr. Wang in a letter to the Secretary of the Maryland Department of General Services (A.R. 696). The related issue of riprap protection was also raised by the Mann Report, in paragraph three of its summary. These issues, too, were addressed by the Corps during its deliberation on the Hart and Miller Islands project. Memoranda dated January 22 and February 6, 1973 (A.R. 119, 130) indicate that the Corps was originally skeptical that a one-to-three slope could be achieved with safety. At the October 22 and November 26, 1975 meetings, however, the dike slope and riprap issues were discussed (A.R. 712, 716, 729). The memorandum regarding the November 26, 1975 meeting (A.R. 729) states as follows:

> After some discussion, it was agreed by all present that the IV on 3H slopes as shown, would be satisfactory from deep and shallow failure considerations, provided the filter cloth, below water level, was replaced by 2.5 ft. of pea gravel for long term seepage control.

Finally, the E.I.S. sets forth the Corps' conclusions regarding the structural integrity of the Hart and Miller diked disposal area at 46:[12]

---

12. The statements in the E.I.S., although demonstrating the Corps' concern with the structural integrity of the dike, do not illustrate the Corps' consideration of the problems raised by the Mann Report as fully and clearly as do the documents in the administrative record cited in the body of this opinion. In determining whether the Corps gave adequate consideration to certain issues, this court may look beyond the Impact Statement and examine the entire record before the reviewing agency. *E. g.*, 5

U.S.C. § 706; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *Fayetteville Area Chamber of Commerce v. Volpe, supra*, 515 F.2d at 1024. It should also be noted that the E.I.S. in this case does make reference, at 129, to the Peer Review Evaluation prepared by Roy Mann Associates, and a careful examination of the E.I.S. would thus lead a reader to the Mann Report and to the objections to the dike's structural integrity expressed therein. The Impact

Comprehensive design analysis and development of overtopping frequency estimates were performed by the Baltimore District for the proposed dike design in order to assure the structural integrity and safety of the retention structure. Results of these analyses are as follows:

a. The dike design elevation of 18 feet above mean low water assures that the disposal area would have virtually no chance of being overtopped. This conclusion is based on a conservatively computed overtopping frequency of once every 2,0000 [sic] years. This frequency was arrived at by first establishing the 2,000 year wind speed frequency for this area for winds from a southerly direction, from Thom's Fastest Mile (Thom, 1968). The resulting wind speed was used to derive an expected wave height which was then superimposed on the 2,000 year hurricane tide, as projected from 71 years of tide records from the gage at Fort McHenry. Wave runup computations, and water depth and fetch for the area were incorporated with this data to obtain the expected overtopping frequency.

b. Structural integrity of the proposed dike design is satisfactory subject to inclusion of the following modifications:

1. Filter cloth to be used on the Chesapeake Bay side of the dike to below water level, will only be used above the water level. That to be used below the water level will be replaced with 2½" thickness of pea gravel.

2. A bay-side toe consisting of several feet of pea gravel and riprap and about ten feet wide, will be provided between stations 110 to 120 and 220 to 230 (see Figure 3, page 4).

3. Along the remainder of the dike alignment, approximately stations 80 to 110, 120 to 220, and 230 to 260, an impervious blanket will be constructed along the inside toe of the dike and will extend up to 200 feet from the toe. This would be constructed during disposal of dredged material within the diked area. The thickness of the blanket would be equal to or greater than the head of water above it, and would consist of materials finer than the No. 200 sieve.

4. Casagrande type piezometers will be placed between Stations 110 to 230 to measure the phreatic surface and seepage pressures during operation.

These modifications will be incorporated into the final dike design in the event that approval is given to this pending permit application.

▇▇ Plaintiffs point to several documents in the administrative record, some of which have been adverted to above, which reflect the Corps' skepticism about certain aspects of the plans and specifications for the proposed dike.[13] Presumably, plaintiffs by this evidence seek to persuade the court that the questions of structural integrity which they raise are serious ones. This court does not doubt the significance of the criticisms levelled against the Hart and Miller Islands project by the Mann Report and by Dr. Wang, and it readily agrees with plaintiffs that there are qualified experts who believe that the proposed dike is structurally unsound. The very evidence relied upon by plaintiffs, however, demonstrates the Corps' awareness of these issues, and the documentation from the administrative record cited above satisfies this court that the Corps considered the issues as well. Consideration of the issues is all that this court can properly require of the Corps, *Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra*; the court cannot substitute its judgment for that of the Corps of Engineers nor determine who among competing experts presents the most reliable information or reaches the most correct conclusions, *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2731 n. 21, 49 L.Ed.2d 576 (1976); *County of Suffolk v.*

Statement itself thus alerts the reader to opposing viewpoints, one of its more important functions.

13. Statement of Material Facts as to Which There is No Genuine Issue, ¶ 14, submitted by Plaintiffs in Support of Motion for Summary Judgment.

748

Secretary of the Interior, 562 F.2d 1368, 1383 (2d Cir.), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

Plaintiffs enumerate further potential construction failures allegedly not addressed by the Corps: failure to complete once started, failure or inability to close the dike, failure to hold spoil, and failure to retain pollutants. However, plaintiffs present no evidence that any of these failures is likely to occur. In *Warm Springs Dam Task Force v. Gribble, supra,* 621 F.2d at 1026–1027, discussion of the consequences of a total failure of the dam in question was held to be unnecessary:

> [A]n impact statement need not discuss remote and highly speculative consequences. Any substantial risk that the dam could fail would be intolerable... Everyone recognizes the catastrophic results of failure of a dam; to detail the results would serve no useful purpose [citation omitted].

Similarly, the assumption in this case is that construction will be completed and that the dike will serve its intended function of containing dredged spoil. In the absence of evidence that a contrary result is likely to ensue, plaintiffs' suggested failures must be deemed purely speculative, and the E.I.S. cannot be faulted for failure to discuss them.

For these reasons, the court concludes that the Army Corps of Engineers considered the questions raised by plaintiffs regarding the structural integrity of the diked disposal area as designed, and thereby fulfilled the mandate of the Rivers and Harbors Act that it examine the plans and specifications for structures to be built in the navigable waters of the United States, as well as the requirement of NEPA that the environmental impact of proposed projects be taken into account. Defendants' motions for summary judgment as to Count Two of plaintiffs' complaint will, therefore, be granted.

B. *Alternatives*

Plaintiffs contend in Count Three of their complaint that the Corps' consideration of alternatives to the Hart and Miller Islands diked disposal area, as required by NEPA, 42 U.S.C. § 4332(2)(E), was so cursory as to be arbitrary, capricious and an abuse of discretion. Plaintiffs do not argue that an insufficient range of alternatives was considered, but only that those alternatives which do receive attention in the E.I.S. have been inadequately examined.[14] In this regard, Count Seven of plaintiffs' complaint relates to Count Three, and plaintiffs address both counts simultaneously in their motion for summary judgment. Count Seven of plaintiffs' complaint asserts that the relative costs of alternative sites were an important factor in selecting the Hart and Miller Islands location, that the costs of the Hart and Miller Islands dike have not been accurately assessed, and that all comparisons made of the Hart and Miller Islands site to alternative locations are consequently flawed.

Regulations of the Council on Environmental Quality deem the comparison of alternatives to a proposed action to be the "heart of the environmental impact statement," 40 C.F.R. § 1502.14 (1980), and courts have expressed a similar view; *e. g., Swinomish Tribal Community v. Federal Energy Regulatory Commission, supra,* 627 F.2d at 512 (D.C.Cir.1980):

> NEPA's requirement that the agency's "detailed statement" address alternatives to a proposed action "has been aptly characterized as 'the linchpin of the entire impact statement.'" *Alaska v. Andrus,* 580 F.2d 465, 474 (D.C.Cir.1978), vacated in part sub nom. *Western Oil & Gas Assn. v. Alaska,* 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).

The requirement that alternatives be studied, developed and described, however, is subject to a "rule of reason;" In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, supra,* 435 U.S. at 551, 98 S.Ct. at 1215, the Supreme Court stated as follows:

14. Plaintiffs Memorandum in Support of Motion for Summary Judgment at 28.

To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility. As the Court of Appeals for the District of Columbia Circuit has itself recognized:

"There is reason for concluding that NEPA was not meant to require detailed discussion of the environmental effects of 'alternatives' put forward in comments when these effects cannot be readily ascertained and the alternatives are deemed only remote and speculative possibilities, in view of basic changes required in statutes and policies of other agencies—making them available, if at all, only after protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed." *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 15–15, 458 F.2d 827, 837–838 (1972).

*See also Life of the Land v. Brinegar,* 485 F.2d 460 (CA9 1973), *cert. denied,* 416 U.S. 961 [94 S.Ct. 1979, 40 L.Ed.2d 312] (1974). Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

Plaintiffs in this case are concerned not with the range of alternatives explored in the E.I.S., but with the level of scrutiny applied to those alternatives. The "rule of reason," however, "governs both *which* alternatives the agency must discuss and the *extent* to which it must discuss them," *State of Alaska v. Andrus,* 580 F.2d 465, 475 (D.C.Cir.1978) (emphasis in original); *vacated in part sub nom. Western Oil and Gas Association v. Alaska,* 439 U.S. 922, 99 S.Ct.

303, 58 L.Ed.2d 315 (1978). *See also North Slope Borough v. Andrus, supra; Lange v. Brinegar, supra,* 625 F.2d at 818; *Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398, 400 (4th Cir. 1977); *Fayetteville Area Chamber of Commerce v. Volpe, supra,* 515 F.2d at 1027–1028; *National Center for Preservation Law v. Landrieu, supra,* 496 F.Supp. at 733–734.

The Final Environmental Impact Statement discusses several alternatives to the Hart and Miller Islands diked disposal facility, including cessation of dredging in the Upper Chesapeake Bay, open water disposal, on-land disposal, use of dredged material to manufacture bricks or reclaim strip mines, as well as diked disposal structures situated at other locations (E.I.S. 52–62a). Furthermore, in Section Eight of the Impact Statement, entitled "Coordination with Others," the Corps responds to suggestions made by the Hart and Miller Islands Area Environmental Group that sites other than the Hart and Miller Islands should receive further consideration. Finally, Volume III of the Trident-Green Report, in which seventy potential diked disposal facility sites were evaluated, is reproduced as Appendix C of the Impact Statement. This study was performed for the State of Maryland by Green Associates and Trident Engineering Associates, now known as Century Engineering, the designers of the Hart and Miller Islands project.

Plaintiffs launch several specific criticisms against the discussion of alternatives set forth in the E.I.S. First, plaintiffs argue that the E.I.S. approaches the project "as though the only alternative is no dredging whatsoever ... the writer [of the E.I.S.] takes the position of an advocate as though justifying an already decided position." [15] Plaintiffs offer no evidence to support this characterization. Furthermore, as noted above, several alternative disposal methods are considered in the Impact Statement, and the relative benefits and disadvantages of each are discussed. Having examined pages 52 through 62a of the E.I.S., the court concludes that plain-

---

**15.** Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 19.

tiffs' allegations of *post hoc* rationalization and superficiality of examination of alternatives are without merit.

Plaintiffs next contend that the incorporation of the Trident-Green study as Appendix C of the Environmental Impact Statement is a procedurally improper delegation of authority under NEPA, citing *Essex County Preservation Association v. Campbell*, 399 F.Supp. 208, 214 (D.C.Mass. 1975). Plaintiffs in the *Essex County* case sought an injunction, alleging *inter alia* that the Environmental Impact Statement involved there was prepared by the private consulting firm which was also the design engineer for the project in question. Although the district court denied plaintiffs' request for injunctive relief, it did find that the delegation of responsibility for preparing an environmental impact statement to a party with a financial stake in the approval of the project to be examined was improper. On appeal, however, while the First Circuit affirmed the district court's decision to deny injunctive relief, it also took issue with the district court's finding of impropriety, 536 F.2d 956 (1st Cir. 1976). The Court of Appeals held that the participation of the design engineers in preparing an impact statement does not necessarily fatally undermine the validity of the statement, and cited a number of cases in which private consulting firms involved in the construction of a project were permitted to assist in drafting the impact statement on that project. In the case at bar, the Corps of Engineers has itself prepared an evaluation of alternatives to the Hart and Miller Islands dike (E.I.S. 52–62a). Furthermore, in light of the First Circuit's decision in *Essex County Preservation Association, supra*, this court finds nothing improper about the inclusion of the Trident–Green Report in the E.I.S. as a supplement to the Corps' own analysis of alternatives.

Plaintiffs find further fault with the Corps' consideration of alternatives because of the summary rejection of potential sites

able to hold no more than 20 million cubic yards of dredged spoil; the Hart and Miller Islands site has a projected capacity of approximately 52 million cubic yards. As the Corps' responses to the comments of the Hart and Miller Islands Area Environmental Group indicate, however, the construction of smaller dikes would result in a higher cost per cubic yard of capacity, because several expensive construction projects would have to be undertaken to achieve the containment capabilities offered by one site at the Hart and Miller Islands (E.I.S. 116–125, 57–62a).[16]

Plaintiffs also point out in this regard that the State of Maryland's original ambition was to construct a facility able to contain 100 million cubic yards of dredged spoil, and that the selection of the Hart and Miller Islands site, capable of only half that amount, reflects a willingness to consider smaller facilities. Because smaller sites were dismissed from consideration on the basis of a 100 million yard capacity standard, argue plaintiffs, they must be reconsidered now in light of the 50 million cubic yard criterion satisfied by the Hart and Miller Islands site. The court is not persuaded by this line of reasoning. No matter what total capacity the State of Maryland seeks to achieve, the Corps has determined that it is more efficient to construct a small number of large facilities than it is to build many smaller ones. Having examined the Corps' Impact Statement and considered plaintiffs' contentions, the court concludes that the Corps gave reasonable consideration to a large number of alternative potential sites, and that having done so, it has satisfied NEPA's procedural mandate. It is not within this court's power or responsibility to question the wisdom of the selection of the Hart and Miller Islands site from among those alternatives.

Plaintiffs' final line of attack against the Corps' consideration of alternatives to the

---

**16.** Cost is, of course, a legitimate criterion for the Corps to apply in determining whether or not to approve a particular site. Environmental concerns need not be elevated over other appropriate considerations, *Strycker's Bay Neighborhood Council v. Karlen, supra*, 444 U.S. at 227, 100 S.Ct. at 500.

Hart and Miller Islands dike is the allegation that the cost data used to compare alternative sites are grossly inaccurate. To support this assertion, plaintiffs first argue that any estimates of the cost of building the Hart and Miller Islands dike are unreliable because the expense of certain aspects of the construction process cannot now be determined; for example, the amount of unsuitable foundation material that will have to be removed cannot be precisely predicted. That certain items of the cost of construction cannot be accurately foreseen does now, however, render the cost estimates made in the E.I.S. valueless as a basis for comparison. Plaintiffs further contend that construction of the dike "will be plagued by over-runs, design deficiencies, shut-downs due to weather conditions, and other problems attendant with the implementation of a faulty design."[17] Plaintiffs offer no evidence to support these conclusory statements, however, nor do they suggest any reason to believe that the Hart and Miller Islands site will be uniquely subject to the problems they raise.

Plaintiffs characterize the cost estimates contained in the Impact Statement as unreasonable, and support this contention by reference to a study, submitted as an exhibit to their motion for summary judgment, entitled "Cost Estimate of a Spoil Disposal Complex at Hart and Miller Islands," prepared by Admiral Edgar Keats, president of a private consulting firm, at the request of the Hart and Miller Islands Area Environmental Group. This study concludes that the cost of constructing a diked disposal area at the Hart and Miller Islands site will be more than twice as great as indicated in the Corps' E.I.S.

The Keats Report cannot serve as the basis for comparing the costs of alternative sites, because it is addressed only to the Hart and Miller Islands project. In addition, this court has already noted that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts, supra,* 411 U.S. at 138, 93 S.Ct. at 1242.[18] The Keats study is not part of the administrative record in this case, was not before the Corps during its deliberations over the State of Maryland's permit application, and therefore should not be considered by this court in its review of the Corps' decision. Finally, even if this court were to consider Admiral Keats' report, it would still defer to the expertise of the Corps in assessing the costs of constructing the Hart and Miller Islands dike. Plaintiffs do not contend that the costs of the project were not considered, but only that the Corps' assessment of them is inadequate and incorrect. An evaluation of the merits of this contention, however, is not within the purview of the court's role in this case. There is nothing in the administrative record to suggest that the Corps' consideration of the costs of the proposed project was irrational or unreasonable, and there this court's inquiry ends.

The real thrust behind plaintiffs assertions of failure to consider alternatives is that the Corps was wrong in selecting the Hart and Miller Islands site as the most favorable for the dike project. Plaintiffs imply that it would be preferable to dispose of dredged material by means of open water dumping, on-land disposal, strip mine reclamation, brick manufacture, highway side-slope replacement, or diked areas located somewhere other than the Hart and Miller Islands. In presenting their arguments, however, plaintiffs misconceive the role of the court. As has been noted above, the mandate of NEPA is "essentially procedural," designed "to insure a fully informed and well considered decision," but not necessarily the decision the court would reach. *Strycker's Bay Neighborhood Council v. Karlen, supra,* 444 U.S. at 227, 100 S.Ct. at 500; *Vermont Yankee Nuclear Power Corp. v. NRDC, supra,* 435 U.S. at 558, 98 S.Ct. at 1219. Upon ascertaining that alternatives to the proposed project were given reasonable consideration by the Corps, this court

17. Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 27.

18. *See* note 11, *supra.*

has completed its task; the decision of which alternative to pursue is left to the expert discretion of the agency involved; *e. g., South Louisiana Environmental Council, Inc. v. Sand, supra,* 629 F.2d at 1010–1012. Consequently, for the reasons discussed above, this court concludes that the mandate of 42 U.S.C. § 4332(2)(E), so far as this court's powers of enforcement are concerned, has been fulfilled, and defendants' motions for summary judgment as to Counts Three and Seven of plaintiffs' complaint will be granted.

### C. *Adverse and Cumulative Environmental Effects*

In their motion for summary judgment, plaintiffs combine their arguments in support of Counts Four, Five and Eight of their complaint. Count Four asserts that the Corps has failed to consider adequately the cumulative effects of the proposed project as required by Corps regulation 33 C.F.R. § 320.4(2)(iv) (1979), which states as follows:

> (2) The following general criteria will be considered in the evaluation of every application:
>
> \*    \*    \*    \*    \*    \*
>
> (iv) The probable impact of each proposal in relation to the cumulative effect created by other existing and anticipated structures or work in the general area.

Count Five alleges that the E.I.S. devotes insufficient attention to the general environmental consequences of the Hart and Miller Islands dike, and Count Seven argues that substantial questions regarding the feasibility and advisability of constructing the facility are ignored or minimized in the Impact Statement.

▮▮▮ As is true with regard to the discussion of alternatives to a proposed project, the adequacy of the consideration given to environmental factors is to be judged by a standard of reasonableness; a court is governed by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*County of Suffolk v. Secretary of the Interior, supra,* 562 F.2d at 1375; *see also North Slope Borough v. Andrus, supra; National Center for Preservation Law v. Landrieu, supra,* 496 F.Supp. at 724. Furthermore, with regard to cumulative environmental effects, only the consequences of projects that have actually been proposed must be discussed in the Impact Statement; actions that are merely contemplated need not be addressed:

> At some points in their brief respondents appear to seek a comprehensive impact statement covering contemplated projects in the region as well as those that already have been proposed. The statute, however, speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects. *Cf.* n.26, *infra.*

*Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n. 20, 96 S.Ct. at 2730 n. 20 (emphasis in original). *See also South Louisiana Environmental Council, Inc. v. Sand, supra,* 629 F.2d at 1015–1016. Indeed, even proposed projects need not always be considered in the E.I.S.:

> Nor is it necessary that petitioners always complete a comprehensive impact statement on all proposed actions in an appropriate region before approving any of the projects. As petitioners have em-

phasized, and respondents have not disputed, approval of one lease or mining plan does not commit the Secretary to approval of any others; nor, apparently, do single approvals by the other petitioners commit them to subsequent approvals. Thus, an agency could approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals. *Cf.* n. 20, *supra.*

*Kleppe, supra,* 427 U.S. at 414 n. 26, 96 S.Ct. at 2732 n. 26.

In presenting their first contention of failure to address environmental impacts, plaintiffs emphasize that the effects of dredging an access channel for hopper dredges are not discussed in the Impact Statement, although the likelihood that such a channel will be dredged is mentioned at several points throughout the E.I.S. (*e. g.*, E.I.S. 5, 45, 65, 80, 83). The discussion in the E.I.S. adverted to by plaintiffs, however, reveals that the hopper dredges are only one means of transporting dredged spoil, that other methods would not require the creation of an access channel, and that the method to be used at the Hart and Miller Islands site had not yet been determined at the time the E.I.S. was completed. (E.I.S. 5, 44, 83). Indeed, the affidavit of James B. Coulter, the Secretary of the Maryland Department of Natural Resources, submitted as an exhibit to defendant State of Maryland's motion for summary judgment, indicates that dredging to create an access channel will not be necessary because shallow draft barges, not hopper dredges, will be used to transport dredged spoil.

■ The Supreme Court's statements in *Kleppe*, excerpted above, were addressed to the cumulative effects of actions which would require the preparation of an additional E.I.S.; presumably, the State of

Maryland could decide to dredge an access channel without federal approval and, therefore, without the need for a second Impact Statement. This court believes, however, that the import of the Court's comments in *Kleppe* is that purely speculative actions need not be considered in the E.I.S. This reading of *Kleppe* comports with the decision in *State of Alaska v. Andrus, supra,* which held that "agencies may not be precluded from proceeding with particular projects merely because the environmental effects of that project remain to some extent speculative," so long as the cost of proceeding without more and better information has been considered. *Id.* at 473.

As was noted above, the potential need for an access channel to accommodate hopper dredges is mentioned several times in the E.I.S. Furthermore, the Impact Statement contains a brief description of some of the impacts of dredging such a channel (E.I.S. 45). Because the need for an approach channel was merely speculative, this brief description strikes the court as reasonable and adequate under the circumstances; in light of the fact that various methods of disposing of dredged material were still being contemplated when the Impact Statement was completed, the failure to address more fully the effects of dredging an approach channel cannot be considered a fatal flaw.[19] Even if plaintiffs could convince the court that this was a serious shortcoming of the Impact Statement, their complaint in this regard would be mooted by the State of Maryland's subsequent decision to employ a means of transporting dredged spoil that will not require an access channel; it would be a pointless gesture for the court to require the Corps to consider the impact of an action that it is now known will not occur.

■ Plaintiffs next take issue with the failure of the E.I.S. to address the environmental effects of possible expansion of the Hart and Miller Islands dike. The proposed

19. *See Vermont Yankee Nuclear Power Corp. v. NRDC, supra,* 435 U.S. at 558, 98 S.Ct. at 1219: "a single alleged oversight on a peripheral issue ... must not be made the basis for overturning a decision properly made after an otherwise exhaustive proceeding."

Hart and Miller Islands diked disposal facility will contain approximately fifty-two million cubic yards of sediment when filled to capacity (E.I.S. 1). If the Baltimore Harbor is deepened to fifty feet, as has been contemplated, it is estimated that 100 million cubic yards of bottom sediment will be dredged from the Harbor and nearby channels during the next twenty years (E.I.S. 9). The E.I.S. raises the possibility of subsequent expansion of the dike (E.I.S. 63), but does not discuss what the environmental impact of such expansion would be.

This argument can fare no better than that made regarding the access channel. It is not at all certain that the contemplated deepening of the Baltimore Harbor with which plaintiffs are concerned will in fact occur (e. g., E.I.S. 66). Furthermore, even if expansion of the Hart and Miller Islands dike is currently contemplated, it has not yet been proposed. If expansion of the dike is proposed at some future time, the environmental consequences of such a project will then be addressed. This is precisely the situation to which the Supreme Court spoke in *Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n. 20, 96 S.Ct. at 2730 n. 20, and the teaching of *Kleppe* is that the environmental consequences of expanding the Hart and Miller Islands diked disposal structure need not be evaluated in the Impact Statement under review here.

Plaintiffs raise further environmental concerns which they believe have received inadequate attention from the Corps or about which they assert the Corps has reached incorrect conclusions. In this regard, plaintiffs first challenge the statement made in the E.I.S. that the Hart and Miller Islands area "is not a recognized spawning or breeding ground for commercially important or unique fish or shell fish (E.I.S. 46a, 50). Plaintiffs support this challenge primarily by reference to letters written to the District Engineer for the Baltimore District of the Corps by the Regional Directors of the National Marine Fisheries Service of the United States Department of Commerce and the Fish and Wildlife Service of the United States Department of the Interior (A.R. 385, 703).

These letters assert that important recreational and commercial species of fish use the shallow waters of the project site for spawning, nursing, feeding and migration purposes, and urge the Corps to consider alternatives to the Hart and Miller Islands site.

■ The goal of NEPA is to "insure a fully informed and well-considered decision," *Vermont Yankee Nuclear Power Corp. v. NRDC, supra,* 435 U.S. at 558, 98 S.Ct. at 1219. Once the reviewing court has determined that the agency has taken a "hard look" at the environmental consequences of its actions, the court cannot interfere with the agency's discretion as to what course of action to take; *Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21. *See also, National Center for Preservation Law v. Landrieu, supra,* 496 F.Supp. at 737.

The very evidence relied upon by plaintiffs demonstrates that the Corps was aware of the impact of the project, in the views of the authors of the letters referred to, on certain species of fish. Furthermore, under the heading, "Any Adverse Environmental Effects Which Cannot Be Avoided Should the Proposal Be Implemented," the Impact Statement discusses the consequences of the project for marine life:

Some benthic organisms will be destroyed during dredging operations. Temporary turbidity and siltation from the hydraulic dredging process will be unavoidable but should have only minor effects on the estuarine environment, as mentioned in the previous section. Wetlands lost by construction of the dike would be 10.9 acres of Hart Island (11.5%) and 18.4 acres (52.4%) of Miller Island, for a total of 29.3 acres. Wetland vegetation lost is shown on Figures 8 and 9. However, the more heavily used wetland areas are not included in project construction. Dredging accomplished during seasons of fish spawning and shellfish setting could adversely impact on endemic species. Dredging will indirectly result in increased boat traffic, and may possibly

result in increased levels of water pollution as a secondary impact of this boating activity. Increased recreational use of the island may also accentuate the existing level of pollution (such as littered cans and bottles) unless there is a provision for trash pick-up. The spoil placement operation (at the discharge end of the pipeline) may also be unsightly during the active project life, although vegetation will rapidly establish in moist areas over the completed portions of the enclosure.

The project is not within the recognized boundaries of commercially important or unique fish or shellfish spawning areas in the Upper Bay. There will be a limited effect on spawning of a few species, because some spawning takes place in practically all shallow waters, but it will not significantly affect the important spawning grounds of the Upper Bay. Water quality standards will not be modified to accommodate the project.

(E.I.S. 50). Although this view is considerably more sanguine than that expressed in the letters emphasized by plaintiffs, plaintiffs have not presented any evidence which directly contradicts the statements made in the E.I.S.[20] Even if the letters from the Interior and Commerce Departments are construed as irreconcilable with the evaluation made in the E.I.S., that would present no more than a conflict among experts which is beyond the competence of this court to resolve. In *County of Suffolk v. Secretary of the Interior, supra,* 562 F.2d at 1383, the court stated as follows:

> The court's task is merely "to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Sierra Club v. Morton,* 510 F.2d at 819. "The court is not empowered to substitute its judgment for that of the agency." *Scenic Hudson Preservation Conference v. FPC,* 453 F.2d 463, 468 (2d Cir. 1971) *cert. denied,* 407

U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972), quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is particularly true when it comes to evaluating the factual conclusions of the EIS. If the agency's conclusions have a "substantial basis in fact," *FPC v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972), and if the EIS has set forth responsible opposing scientific views, *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S. App.D.C. 380, 463 F.2d 783 (1971), it is not for the district court to resolve conflicting scientific options. Evidence-weighing must be left to the agency making the policy decisions. *See Udall v. Washington, Virginia and Maryland Coach Company,* 130 U.S.App.D.C. 171, 398 F.2d 765, 769 (1968), *cert. den.,* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969).

The Corps' E.I.S. discusses the likely effect of construction of the Hart and Miller Islands dike on the estuarine environment. Furthermore, the opposing comments of the Interior and Commerce Departments about this issue are set forth in the Impact Statement (E.I.S. 81–82, 92, A–13—A–28). This court therefore concludes that, although plaintiffs have presented credible evidence from the administrative record that this project will have serious environmental consequences for marine life, the Corps has satisfied the requirements of NEPA by considering the problem and setting forth in the E.I.S. its own comments as well as those of other agencies regarding it.

In its discussion of the environmental setting without the project, the Impact Statement concludes that waterfowl make little use of the Hart and Miller Islands area (E.I.S. 26). Plaintiffs challenge this conclusion as based on insufficient data, and point out that the conclusion is founded upon a summary of aerial waterfowl surveys communicated by means of an informal note which concludes, "I wouldn't rely very

---

**20.** The E.I.S. suggests that the Hart and Miller Islands area is not a critical spawning ground for commercially important fish. The letters adverted to by plaintiffs assert that some commercial species use the area for spawning and other life-sustaining activities.

heavily on what's presented here" (A.R. 88). The Impact Statement, however, candidly reports that its conclusion is based on unpublished data which may not be reliable because of an enumerated list of independent variables, and these variables are the same as those cited in the informal note to explain the reservations expressed about the data presented. Consequently, the shortcomings of the aerial surveys are made clear to any reader of the Impact Statement. Furthermore, in a separate section of the E.I.S. addressed to the environmental effects of the proposed dike, the aerial survey data is not relied on; instead, the E.I.S. refers to a 1968 wetlands evaluation which found that the Hart and Miller Islands wetlands area is used by many ducks, geese, swans and gulls, and that this waterfowl use will be diminished during construction of the dike (E.I.S. 46a–47).

The E.I.S. goes on to conclude that waterfowl use will increase once construction of the dike is completed (E.I.S. 46a–47). Plaintiffs challenge this conclusion as well, citing the Impact Statement's remark that "[t]he most ubiquitous species in disposal areas is reed, ... a poor food plant for either birds or mammals" (E.I.S. 47). The Impact Statement continues this discussion of plant life, however, and concludes that the reed will eventually be replaced by upland grasses and shrubs, and that observations of waterfowl use of diked disposal areas have been reported by the National Audubon Society. For these reasons, plaintiffs have failed to persuade the court that the Corps has devoted insufficient attention to the environmental consequences of the Hart and Miller Islands project for waterfowl.

Plaintiffs further contend that, although the E.I.S. concedes that dredging may result in increased boat traffic and commensurately greater water pollution, it fails to address the effects of the increased boat traffic on the environment or the dike itself (E.I.S. 50); plaintiffs refer to comments made by the Department of the Navy in 1973 to support their position (E.I.S. A34). In response to the Navy's comments, the Corps stated that it would revise its Draft Environmental Statement to reflect the Navy's concern with the ecological impact of opening the Hart and Miller Islands area to public use and increased ship traffic. The effects of increased recreational boating use are discussed, albeit briefly, in the Impact Statement (E.I.S. 36, 51). Plaintiffs also allege a failure to consider the environmental impact of increased commercial ship traffic resulting from the deepening of the Baltimore Harbor. As has already been discussed, however, whether or not this deepening will occur is uncertain at this time, and merely contemplated actions need not be addressed in an E.I.S.

Plaintiffs raise yet further claims of inadequate consideration of environmental consequences and insufficient data to support conclusions reached, regarding, for example, the Corps' determination that waterfowl use will increase after construction is completed, and the duration of filling and dredging operations and their effects. The court reiterates, however, that the adequacy of an Impact Statement is to be judged according to a rule of reason, e. g., *County of Suffolk v. Secretary of the Interior, supra,* 562 F.2d at 1375; *State of Alaska v. Andrus, supra,* 580 F.2d at 475 ("rule of reason necessarily governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.") (emphasis in original). The *State of Alaska* decision did note that the analysis in an Impact Statement should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs and risks of the proposed action; the agency need not, however, "elevate environmental concerns over other appropriate considerations." *Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra,* 444 U.S. at 227, 100 S.Ct. at 500. This court has reviewed the sections of the Environmental Impact Statement entitled "Environmental Impact of the Proposed Action" and "Any Adverse Environmental Effects Which Cannot Be Avoided Should the Proposal Be Implemented," as well as statements made in other sections of the E.I.S. to which the

parties have made reference. Keeping in mind the governing legal principles, the court has determined that the discussion of environmental effects is both reasonable and sufficiently detailed to reveal the bases of the Corps' evaluation of the proposed project's ecological and economic costs and benefits.

Finally, plaintiffs stress the objections of other federal agencies involved with environmental issues to the Hart and Miller Islands project. The Environmental Protection Agency (EPA), in a letter dated September 23, 1976, expressed concern over many issues, including whether or not additional wetlands will be created to compensate for those lost due to dike construction, whether or not the Hart and Miller Islands complex will ultimately be used as a recreational facility, and whether or not alternatives to diked disposal areas will be considered in the future (A.R. 795). Although expressing reservations, the EPA did lend its support to the Hart and Miller Islands project in this letter. By letter dated October 13, 1976, however, the EPA reversed its position and withdrew its approval of the project as a result of its continuing concern over the structural integrity of the proposed dike (A.R. 799).

The National Marine Fisheries Service asserted its objections to the Hart and Miller Islands project in a letter to the Corps of Engineers dated September 17, 1976 (A.R. 790): [21]

> In summation, we do not believe that the applicant has convincingly demonstrated that the Hart and Miller Islands disposal site is necessarily the best available, based on our assessment of the potential impacts on living marine resources and their environments. Our doubts regarding the proposed project stem from the paucity of biological and engineering data that have been made available, and the fact that biological and other information presented in the FEIS was often inconsistent. Therefore, in our opinion, a sufficient data base does not exist from which we can recommend a site which would result in the least environmental impact.

In a similar vein, the Department of the Interior informed the Corps of its conclusion that the Final Environmental Impact Statement on the Hart and Miller Islands project was deficient in a letter dated September 21, 1976 (A.R. 793):

> A June 30, 1976 letter from Under Secretary Frizzell to General Gribble, pursuant to the Memorandum of Understanding, identified areas of concern to this Department. We have reviewed the final environmental impact statement (FEIS) with these concerns in mind. We have concluded that it is deficient in at least three areas: (1) its recognition and discussion of the total spoil disposal problem in the Chesapeake Bay system, of which Hart-Miller is only a partial answer, and the cumulative environmental impacts which will result; (2) treatment of alternative disposal sites in sufficient depth so that an informed comparison and judgment can be made on the best location or locations for spoil disposal; and (3) identification of the final use to be made of the Hart-Miller complex following completion of the spoil disposal project in terms of recreational and fish and wildlife values.
>
> * * * * * *
>
> Despite our reservations regarding the use of Hart and Miller Islands as a diked disposal facility, in preference to other sites, we do recognize that our position is based primarily on a concern for marine resources and that other concerns must be taken into account in the public interest decision-making process. Further, we appreciate the importance and urgency of dredging in Baltimore Harbor and the approach channels.

**21.** When read in context, the Service's position, although firm, appears less harsh than it does in the excerpt quoted above; the Service also stated in its letter that

[n]otwithstanding our environmental concerns, we do recognize that other, very important and pragmatic issues are involved in the permitting decision. We recognize, for instance, the necessity of maintaining adequate navigation channels into the Baltimore Harbor... Therefore, if the Department of the Army determines that permit issuance is in the public interest, we will of course respect the validity of that decision.

Although the Department softened its position in a subsequent letter, it continued to express reservations about the wisdom of the Hart and Miller Islands project and the adequacy of the Corps' Environmental Impact Statement (A.R. 807).

██ Plaintiffs do not argue that the views expressed by the Environmental Protection Agency, the Department of the Interior and the National Marine Fisheries Service, standing alone, have any particular legal significance. Rather, they offer the statements made by these agencies to buttress the allegations of their complaint. The court is impressed by the weight of the evidence presented by plaintiffs and the light it sheds on the possible consequences of the Hart and Miller dike. These agency comments do not, however, persuade the court that plaintiffs' claims merit further discussion than they have already received. The requirement of NEPA is that Federal agencies with special expertise be consulted and allowed to comment upon the proposed action;[22] that the comments of the agency consulted are negative does not give rise to a NEPA violation.

### D. *Abuse of Discretion*

Count Eleven of plaintiffs' complaint is founded upon 5 U.S.C. § 706(2), which provides in pertinent part that a reviewing court shall:

hold unlawful and set aside agency action, findings and conclusions found to be (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law... (C) in excess of statutory jurisdiction, authority, or limitations... (D) without observance of procedure required by law.

*See also Citizens to Preserve Overton Park v. Volpe, supra.*

To support their argument that the Corps' decision should be set aside pursuant to 5 U.S.C. § 706(2), plaintiffs rely primarily upon the objections discussed above, each of which has been found to be without merit. In addition, however, plaintiffs cite a memorandum prepared by E. Manning Seltzer in his then capacity as Chief Counsel of the Army Corps of Engineers (A.R. 876). This memorandum states, "It is my considered opinion that proceeding further on the present administrative record will result in summary judicial reversal," and then explains the reasons for this assertion:

3. Before proceeding with detailed description of the legal shortcomings in each of the four parts of the administrative record, I would like to make the following general comments:

a. It is apparent that a deliberate effort was made to treat the State application in isolation, yet the Federal project to deepen Baltimore Harbor to 50 feet is closely related to the need for a disposal facility of sufficient capacity, and this Federal interest in the ultimate decision must be recognized.

b. The financial ability of the State to select and construct at another site is nowhere discussed, but should be in order to overcome an objection that the Hart and Miller site was selected merely because limited finances are available to the State.

c. The Chesapeake Bay model studies would furnish detailed data on upper bay currents and the postponement of selection of any site pending the completion of studies should be discussed.

4. A supplement to the EIS is needed to overcome the following legal insufficiencies:

a. Describe the environmental impact of dredging a 3 to 5 mile access channel, both for hopper dredges and a more shallow channel if the District Engineer substantiates that hopper dredges will not be used.

b. Describe the environmental impact of restricted outlets from Back River in view of the doubling of discharges from the new sewage disposal plant on Back River.

c. The EIS states that an anticipated capacity in excess of 100 million c.y. will be required, yet the present application is

22. 42 U.S.C. § 4332(2)(C).

for a facility having a capacity of 52 million c.y. It is unacceptable to state that expansion will be subject to future permits when the C.E.Q. guidelines require consideration of cumulative impacts. The EIS on page 60 describes potential capacity of 200 million c.y.; the basis for this statement, the diking anticipated to achieve this capacity, and the environmental impact should be discussed.

Defendants point out that this undated memorandum was most likely prepared prior to May 10, 1975.[23] The memorandum makes reference to the need to hold a public hearing with regard to the Hart and Miller Islands project, and the administrative record shows that the last such hearing was held on May 10, 1975 (A.R. 527). Consequently, reason defendants, the memorandum must have been addressed to a draft of the Impact Statement, and was certainly prepared without the benefit of the meetings, discussions, memoranda and letters regarding the project subsequent to May 1975 listed in the administrative record; the Final Environmental Impact Statement was not completed until February 1976. In addition, the memorandum was prepared without the benefit of the Supreme Court's decisions in *Strycker's Bay, supra* and *Vermont Yankee, supra.*

▆ Several of the objections raised by the General Counsel's memorandum have been discussed in previous sections of this opinion. Others, contend defendants, were considered but were found to be without merit; for example, the Final Impact Statement concludes that there will be no effect from the project on the flushing of the Back River (E.I.S. 71), thus obviating the need for the discussion suggested in paragraph 4.b of the General Counsel's memorandum. Furthermore, defendants assert that the Final Environmental Impact State-

ment was approved by the Corps' Office of General Counsel prior to the issuance of the permit to the State of Maryland.[24] Finally, although the court is willing to consider the legal opinions expressed by the Corps' Office of General Counsel, it does not feel bound to follow them. Thus, the General Counsel's memorandum is of little significance to plaintiffs' claims, and for the reasons discussed above, this court concludes that the Corps' actions were not arbitrary and capricious and should not be held unlawful pursuant to 5 U.S.C. § 706(2).

### E. Bad Faith

In Count Nine of their complaint, plaintiffs assert that the defendant Corps of Engineers acted in bad faith by withholding information from the Department of the Interior during the permit review process. Plaintiffs further contend that the purpose and effect of this withholding of information has been to elicit from the Department of the Interior its approval of the permit based on an inaccurate assessment of the environmental impact of the project.

Plaintiffs have not moved for summary judgment with regard to Count Nine and offer no evidence to support their allegation of bad faith. Defendants have moved for summary judgment on all counts, including Count Nine. A review of the administrative record reveals that the Corps and the Interior Department were in communication during the permit application review process, and that the Department of the Interior was afforded the opportunity to review and comment upon an early draft of the Corps' Impact Statement (E.I.S. A19) as well as upon the Final Environmental Impact Statement prior to its formal completion in February of 1976 (A.R. 793, 807). Rule 56(e) states in pertinent part as follows:

When a motion for summary judgment is made and supported as provided in this

---

**23.** Although the memorandum is not dated, it refers to events which took place in February 1975, and for the reason explained in the body of the opinion, was apparently written prior to the completion of the E.I.S. in February 1976.

**24.** Memorandum of Federal Defendants in Opposition to Plaintiffs' Motion for Summary Judgment at 8. The Corps cites no entry in the administrative record which reflects the Office of General Counsel's final approval of the decision to issue the permit.

rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.[25]

■■■ Defendants have supported their motions for summary judgment by reference to the administrative record in this case, but plaintiffs have not responded by any of the means outlined in Rule 56(e). Consequently, defendants' motions for summary judgment as to Count Nine of the complaint will be granted.

■■■ Plaintiffs allege a second instance of bad faith in Count Ten of their complaint, asserting that defendants have intentionally obfuscated the opposition of local area residents to the Hart and Miller Islands project, and have, by statements made in the Environmental Impact Statement, maligned the character and reputation of those who oppose the building of the dike. Again, defendants have moved for summary judgment on this count, and plaintiffs offer no evidence to support their contentions. Twenty-five pages of comments made by the Hart and Miller Islands Area Environmental Group, Inc., urging that the State of Maryland's permit application be denied, are included in the Impact Statement (E.I.S. A72–A96). Furthermore, the E.I.S. states that public hearings were held at which opponents of the project expressed their views, thus informing the reader that there was public opposition. The Impact Statement characterized this opposition as follows:

> Notable opposition to the proposed project has developed in Baltimore County, and opponents were vocal at each of the three public hearings (two State and one Federal). An article by Joseph Wachtman in the 26 April 72 News

American also mentions a political campaign in Baltimore County in which ". . . many candidates and their supporters have found an antidiked disposal area stance to be politically popular." Opposition is generally against loss of the recreational area on the islands, threat to water quality, negative aesthetic impact, concern that the area will become commercial or industrial land, and a general distrust of truthfulness of government. (E.I.S. 60–61, *see also* E.I.S. 64). The court does not find this characterization to be derogatory. Finally, the Impact Statement contains fifteen pages of comments offered by various citizens groups and the Corps' responses to them (E.I.S. 111–125). Because plaintiffs offer no support for their allegations of bad faith, and because the administrative record indicates that plaintiffs' claim is without merit, defendants' motions for summary judgment as to Count Ten will be granted.

## V. CONCLUSION

By its holding in this case, the court does not lend its imprimatur to the Corps' approval of the State of Maryland's permit application. To the contrary, this court has found some of plaintiffs' substantive arguments to have considerable merit. However, as the court has reiterated throughout this opinion, the Supreme Court has clearly held that the mandates of the National Environmental Policy Act are essentially procedural, and that the court's role in cases like the one at bar is limited and narrow. This court has neither the expertise, the power nor the responsibility to review the merits of the Corps' conclusions, but only the sufficiency under NEPA of the procedures followed in reaching them.

In *National Center for Preservation Law, supra,* 496 F.Supp. at 737, the court summarized the standard of review to be applied to summary judgment motions in cases brought pursuant to NEPA:

**25.** Although the rule itself refers to pleadings, depositions, answers to interrogatories, admissions on file and affidavits as examples of "support," the court sees no reason why documents

in the administrative record should not be considered as well. The Advisory Committee's comments support this view by speaking generally of "evidentiary matter."

The NEPA requires an EIS to discuss certain factors... The legal test for determining the adequacy of a discussion of the necessary factors is one which examines whether or not the subject EIS is one which will provide the decision-makers with sufficient information of the environmental consequences of their action so that they can make a reasoned decision. See *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Sierra Club v. Morton*, 510 F.2d 813 (5th Cir. 1975). Those opposing the agency action on NEPA grounds must advance evidence which is substantial and dependable to prove that an EIS is fatally flawed or a NEPA complaint will not withstand a motion for summary judgment. *Upper Westfork River Watershed Ass'n v. Corps of Engineers*, 414 F.Supp. at 922. This burden is not met by merely establishing a *prima facie* showing of deficiencies. *Conservation Council of North Carolina v. Froehlke*, 435 F.Supp. 775, 791 (M.D.N.C. 1977). In reviewing the adequacy of an EIS as part of the record before the decision-makers in a NEPA case, the district court's sole role is to insure that the sponsoring agencies have considered the environmental consequences of the proposed action. *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980).

For the reasons discussed throughout this opinion, the court believes that plaintiffs have failed to advance substantial and dependable evidence which proves that the Environmental Impact Statement in this case is fatally flawed. Consequently, this court will enter an order denying plaintiffs' summary judgment motion and granting summary judgment to defendants.